J-S38003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF P.A.R. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.J.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 950 WDA 2021 |

Appeal from the Decree Entered July 15, 2021
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
20A In Adoption 2021

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF M.H.R. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.J.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 951 WDA 2021 |

Appeal from the Decree Entered July 15, 2021
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
20 IN ADOPTION 2021

BEFORE:   BENDER, P.J.E., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MARCH 7, 2022**

H.J.S. ("Mother") appeals from the final decrees entered in these cases on July 15, 2021, which involuntarily terminated her parental rights to her minor children, M.H.R. (born in November of 2018) and P.A.R. (born in

_____

[*] Retired Senior Judge assigned to the Superior Court.

October of 2020) ("Child" or "Children").[1]  Additionally, Mother's counsel filed a petition to withdraw and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). After review, we grant counsel's petition to withdraw and affirm the termination decrees.

The permanency goals for each Child were previously changed to adoption.  **See In the Interest of M.R. and P.R.**, 308 WDA 2021 and 309 WDA 2021, unpublished memorandum (Pa. Super. filed Sept. 16, 2021) (**M.R. and P.R. I**).  We rely in part on this Court's rendition of the facts set forth in the **M.R. and P.R. I** memorandum opinion, which states as follows:

> M.R. came into the care of [Erie County Children and Youth Services Agency ("Agency")] by emergency protective order dated December 10, 2019, based on allegations related to parental substance abuse.  A shelter care hearing was held on December 12, 2019.  Mother did not appear at the hearing; Father appeared and stipulated to [a] continuation of shelter care pending the adjudication hearing.
>
> A dependency petition was filed December 13, 2019….
>
> * * *
>
> An adjudication and disposition hearing was held before the juvenile court hearing officer on December 19, 2019.  Both parents were present, though Mother arrived late.  Father was represented by counsel.  The hearing officer found in favor of adjudication.  The hearing officer's recommendation was adopted by court order dated January 8, 2020.  By virtue of that order, Mother's dispositional permanency plan required her to:

---

[1] These matters were consolidated *sua sponte* by this Court by order dated September 9, 2021.  Moreover, we note that the Children's Father is not a party to this appeal.

1. Refrain from the use of drugs and alcohol and participate in random urinalysis testing at the Esper Treatment Center as requested by the [A]gency. If a positive urine screen is received, [Mother] will be referred to the random urinalysis color code program through Esper Treatment Center;
2. Participate in a drug and alcohol assessment and follow through with any recommendations;
3. Participate in a mental health evaluation and follow through with any recommendations;
4. Obtain and/or maintain safe and stable housing and provide the [A]gency with a signed lease to show that she is able to provide stability for [M.R.];
5. Obtain and/or maintain gainful employment and provide the Agency with documentation that she is employed and receives an income;
6. Participate in a parenting education program and demonstrate the ability to provide for [M.R.'s] needs during visitation;
7. Demonstrate the ability to provide for the safety and well-being of the [C]hild[,] to include attending medical, dental, and other needed appointments; and
8. Sign any and all releases requested by the Agency.

Mother's treatment plan was revised a few weeks later to require participation in family dependency drug treatment court.

For the first two review periods (January—May 2020), Mother demonstrated moderate compliance with her permanency plan, except she continued to test positive for marijuana, and on one occasion in January 2020, [she] tested positive for amphetamine/methamphetamine. She underwent the requisite drug and alcohol and mental health assessments and was admitted to family dependency drug court. Her permanency plans were updated accordingly.

Drug testing was unavailable during the second review period due to [the] Covid-19-related shutdown of the Esper Medical Center testing facility. When Mother was tested on two occasions in May and June of 2020, she tested positive for marijuana.

Urinalysis drug testing resumed during the third review period (July—October 2020), but Mother failed to attend screenings after mid-September 2020. When she last appeared for testing, she

tested positive for amphetamines, methamphetamines, and marijuana on September 8, 2020, positive-failure to produce on September 9, 2020, and negative on September 10, 2020. She has not submitted to testing since September 10, 2020. Visitation with M.R. was contingent on clean urines [and], therefore, Mother had no visits with M.R. during the third and fourth review periods.

Mother was discharged from family dependency treatment court by order … dated October 1, 2020, for "consistent failure to attend court, failure to submit to drug testing and non-compliance with treatment recommendations." Criminal docket searches during the third and fourth review periods revealed that Mother was charged with possession of drug paraphernalia in August of 2020 and pled guilty to the charge in December of 2020.

Mother gave birth to P.R. [in] October [of] 2020. The child was taken into protective custody from the hospital based on Mother's ongoing substance abuse and the [C]hild's purportedly having tested positive for amphetamines and opiates at birth.

After the third permanency review hearing on November 2, 2020, the court found there had been no compliance with the permanency plan, and no progress toward alleviating the circumstances that led to [the] original placement, and [it] granted OCY's motion to change the permanency goal for M.R. from reunification to reunification concurrent with adoption. An adjudication and dispositional hearing for P.R. was also held on November 2, 2020. P.R. was placed in the same kinship home as M.R. and assigned the same concurrent permanency goals.

OCY moved to change the permanency goal to adoption after the fourth permanency review period, in January of 2021, alleging parents' noncompliance with their permanency plans. The motion was heard at the time of the fourth permanency review hearing on February 1, 2021. Both parents appeared at the hearing by telephone and were represented by counsel.

*Id.* at 1-3 (quoting the trial court opinion, April 1, 2021, at 1-5).

On March 11, 2021, the Agency filed petitions to terminate Mother's parental rights to both Children. The termination hearing was held on July 13, 2021, and was attended by Mother via telephone due to vehicle problems.

The trial court's opinion sets forth an extensive discussion of the testimony provided by the Agency's witnesses, as well as a lengthy recitation of Mother's testimony. *See* Trial Court Opinion (TCO), 9/10/2021, at 20-33. The court then discussed the grounds for termination, concluding that the facts presented by the Agency supported the termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). On July 15, 2021, the trial court entered the decrees, terminating Mother's parental rights to both Children.

Mother's counsel filed a timely appeal on her behalf, but also submitted a "Statement of Intention to File an *Anders* Brief" in lieu of a concise statement of errors complained of on appeal. This is an acceptable procedure. *See In re J.T.*, 983 A.2d 771 (Pa. Super. 2009). Specifically, the *J.T.* opinion explains:

> Recently adopted Rule 1925(c)(4) creates an exception to the general rule of waiver in criminal cases when counsel files a brief pursuant to *Anders*. In such an instance[,] a concise statement of errors complained of is not required. Rather, counsel "may file of record and serve on the judge a statement of intent to file" an *Anders* brief "in lieu of filing a Statement." If upon review of the advocate's brief required by *Anders,* the appellate court believes that there are arguably meritorious issues for review, those issues are not waived. Instead[,] the appellate court may remand for filing a concise statement of errors complained of, an opinion pursuant to Rule 1925(a), or both.
>
> Because the *Anders* procedure has been engrafted onto parental termination cases by *In Re: V.E. and J.E.,* … 611 A.2d 1267, 1275 (Pa. Super. 1992), counsel's decision to follow the Rule 1925(c)(4) procedure in this parental termination case was proper. In so holding, we ensure symmetry of *Anders* procedure in both the criminal and parental termination contexts.

*Id.* at 773-74. Based upon this explanation in *J.T.*, we conclude that Mother's counsel followed the proper procedure.

Additionally, we recognize that before reaching the merits of Mother's appeal, we must address counsel's request to withdraw. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) ("'When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)). "In *In re V.E.*, … this Court extended the *Anders* principles to appeals involving the termination of parental rights." *In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014). To withdraw pursuant to *Anders*, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa. Super. 2009)). With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, an **Anders** brief must comply with the following requirements:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361.

In the instant matter, counsel has filed a petition to withdraw, certifying that she has reviewed the case and determined that Mother's appeal is wholly frivolous. Counsel also has filed a brief that includes a summary of the history and facts of the case, issues raised by Mother, and counsel's assessment of why those issues are frivolous, with citations to relevant legal authority. Counsel has included a copy of her letter to Mother, advising Mother that she may obtain new counsel or raise additional issues *pro se*. Accordingly, counsel has substantially complied with the requirements of **Anders** and **Santiago**. **See Commonwealth v. Reid**, 117 A.3d 777, 781 (Pa. Super. 2015) (observing that substantial compliance with the **Anders** requirements is sufficient). We, therefore, may proceed to review the issues outlined in the **Anders** brief. In addition, we must "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked

by counsel." ***Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Counsel's ***Anders*** brief lists the following in the section entitled statement of the questions presented:

A. Whether the orphans' court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S. §[]2511(a)(1), (2), (5), [and] (8)?

B. Whether the orphans' court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S. §[]2511(b)?

***Anders*** brief at 3.

We consider these issues mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case as noted above, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Here, with regard to Section (a)(2), the trial court found:

As to 23 Pa.C.S. § 2511(a)(2) in the instant case, on February 1, 2021, Minor Child M.H.R.'s Fourth Permanency Review Hearing was held as well as Minor Child P.A.R.'s first Permanency Hearing.

- 10 -

Mother had "no compliance with the permanency plan" and "no progress toward alleviating the circumstances which necessitated the original placement."

Mother had "a need for [help with] housing, drug and alcohol and also mental health and parenting." Ms. DiCola confirmed [that,] when she ended her services, Mother was "still working on the same issues." Ms. DiCola clarified even though during the thirteen months Ms. DiCola provided services for Mother, Mother was[n't] really making any progress. Mother was not doing enough.

Mother failed to pay her rent and owed landlord $4,553.00. Mother and/or Father received $10,000 from pandemic unemployment but did follow through with Section 8 housing at that time.

Mother was to participate in 36 urines but had: 26 no shows; 4 negatives; 3 failure to produce; … 1 positive for marijuana and 1 for methamphetamine, and 1 for amphetamines, meth, and marijuana. Mother "was pretty argumentative" with providers and "wouldn't take responsibility for any of her actions." Mother blamed [the Agency] and other service providers or would make excuses as to why she wasn't doing what she needed to do on the court order.

Caseworker Rash confirmed services were offered to Mother after April 20, 2020, through Zoom and by telephone. For the following review period in July of 2020, and as the Covid restrictions began to change, Caseworker Rash had not seen any change in how Mother was interacting. On May 29, … 2020[,] and June 11[,] … 2020, Mother tested positive for marijuana. Between April to July 1, 2020, Mother continued visitation with Minor Child M.H.R. through Zoom video chat lasting for fifteen minutes. Caseworker Rash confirmed discussing with Mother … [her] being pregnant and still using drugs, but Mother continued to use. The newly born Minor Child P.A.R. was found to be drug exposed for [m]ethamphetamine. Since Minor Child P.A.R. was discharged from the hospital, Caseworker Rash confirmed Mother did not have any visits with Minor Child P.A.R.

Caseworker Rash confirmed between July of 2020 and November of 2020, Mother went from having "moderate compliance" to "no compliance." In particular, between July 1st of 2020 and October 13th of 2020, Mother was to participate in thirty-six (36) urine

screens. Mother had twenty-six (26) no shows; four (4) negatives; three (3) failure to produce; one (1) positive for marijuana and one (1) [positive] for methamphetamine, and one (1) [positive] for amphetamines, meth[,] and marijuana. On October 1, 2020, Mother was discharged from treatment court due to her consistent failure to attend court, her failure to submit to drug testing, and her non-compliance with treatment recommendations. When providers started seeing Mother face-to-face, Mother "was pretty argumentative" and "wouldn't take responsibility for any of her actions." Mother would blame [the Agency] and/or other service providers for her own shortcomings or Mother would make excuses as to why she was not doing what she needed to do in the Court Order. Caseworker Rash also reported about an "unpleasant interaction" with Mother during a team meeting at Mother's residence in Girard. Mother communicated to Caseworker Rash "she was going to go to the State of Ohio to have her baby so Erie County wouldn't be involved with that child as well."

Caseworker Rash confirmed she also had conversations explaining to Mother as to "how difficult that would make things to move to Ohio." Also Ms. DiCola and Ms. DuShole, as well as the [d]ependency judge at the November 2nd hearing, made it very clear to Mother that if she decided to live in the State of Ohio, it was Mother's responsibility from that point on to seek out her own services that she needed. Mother was cautioned that she would still be responsible to do her urine screens at the Esper Treatment Center.

On October 1, 2020, the Erie County Family Dependency Treatment Court discharged Mother "for consistent failure to attend court, failure to submit to drug testing and non-compliance with treatment recommendations."

In November, when Adoption was established as the concurrent goal with reunification, Mother reported to Caseworker Rash that she was staying in a tent and then in a camper and their vehicle. Mother also said she was staying with other family members in Ohio and at the Geneva Motel in Ohio. As to transportation assistance when Mother was living in Girard, Mother was offered gas cards[,] which Mother accepted, but Caseworker Rash confirmed Mother's ability to transport herself did not improve.

- 12 -

Mother dropped out of services January of 2021, and Mother was still claiming to be a resident in Ohio at that time. As to visitation with either of her children, May of 2020 was the actual last[,] in[-]person visit. When asked how Minor Child M.H.R. is doing since he has been in care, Caseworker Rash stated Minor Child M.H.R. "has been doing great." He is "meeting all his milestones." The pre-adoptive home of paternal uncle was "meeting all of his needs." A "very strong, healthy bond" exists between Minor Child M.H.R. … in his pre-adoptive home with his paternal uncle and his wife. [Caseworker] Rash stated Minor Child M.H.R. has experienced no negative or detrimental effect after not seeing his Mother since the May 2020 in-person visit or virtually since June of 2020. He has had no negative effects by not seeing his Mother for over a year, and he will be three in November. And Minor Child P.A.R. "hasn't seen her parents since she was born" and her paternal uncle and his wife in her pre-adoptive home "are the only parents that she's known." Mother has done nothing to remedy the conditions that led to the placement of her children. Caseworker Rash confirmed it would be in both of these Minor Children's best interest if the Mother's parental rights were involuntarily terminated since "the [M]other has not made any progress on her court[-]ordered treatment plan." Minor Child M.H.R. has been in care with his paternal uncle and his wife "for 19 months[,] which is over half of his life...." Minor child P.A.R. "has been in care for her entire life, which is approximately nine months." In fact, neither Minor Child M.H.R. nor Minor Child P.A.R. … even recognize Mother as their mother. Caseworker Rash stated "it would be more detrimental to not terminate [Mother's] parental rights."

During the instant IVT [(involuntary termination)] trial, Mother confirmed she understands [the Agency] is petitioning the [c]ourt to terminate her rights which would mean the law would no longer identify her as the Mother to either Minor Child M.H.R. and Minor Child P.A.R. However, Mother claimed she is able to take care of Minor Child M.H.R. or Minor Child P.A.R. "because [she] has a place to take them to" and "[she] loves [her] children and [she] was a good mom; [she] does not think what happened was fair." Mother is living in a house where she only has a room, but also has a camper. Her friend, Tiffany, is the owner of this house, and lives there too, with her husband. Mother does not necessarily pay rent, but if Mother has money and her friend needs it, Mother will "help her." Mother admitted using marijuana when asked about her positive test results, but failed to blame herself for not

- 13 -

seeing her son. Mother testified she is bipolar and has PTSD, depression, ADD[,] and ADHD.

Minor Child M.H.R. and Minor Child P.A.R. "are doing very well in their current placement" and the paternal uncle and his wife as Kinship Care is an adoptive resource for them. Caseworker Vicander maintained [that] terminating Mother's parental rights is in "the best interest of these children" because neither Minor Child M.H.R. nor Minor Child P.A.R. have seen Mother in person since June of 2020. In addition, he stated, "parents weren't able to rectify the situation that led to their placement." Caseworker Vicander confirmed there would be "no negative effect" on either Minor Child if Mother's rights would be terminated.

Therefore, under 23 Pa.C.S. § 2511(a)(2), [the Agency] has proven by clear and convincing evidence that Mother's incapacity and neglect have caused Minor Child M.H.R. and Minor Child P.A.R. to be without essential parental care and control. Mother cannot and has not remedied the causes of her incapacity and neglect as to each of these Minor Children, specifically Minor Child M.H.R. and Minor Child P.A.R. Mother has demonstrated a continued inability to conduct her life in a fashion that would provide a safe environment for either or both of these Minor Children, whether that child was living with that parent or not, and her behavior is irremediable as supported by clear and competent evidence thereby justifying granting [the Agency] both Petitions to terminate Mother's parental rights in the instant case.

TCO at 46-50 (citations to the record omitted).

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by terminating Mother's parental rights pursuant to Section 2511(a). The court's findings, stated above, are based upon the testimony provided at the termination hearing and support the court's finding that Mother is incapable of providing Children with the essential parental care, control, and subsistence necessary for their mental and physical well-being, and that Mother is unable to remedy the causes of

- 14 -

her parental incapacity. At the time the court entered its termination decrees, M.H.R. had been in foster care for 19 months and P.A.R. had been in care since birth, and Mother had failed to successfully accomplish any of her goals. It is clear that Mother simply will not, and apparently cannot, become a capable parent for Children at any point in the foreseeable future. Thus, Mother is not entitled to relief as to Section 2511(a)(2).

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We analyze Section 2511(b) as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted).

Notably, in regard to Section 2511(b), the trial court stated in its opinion that:

> Mother "dropped out of services January of 2021" and the parents were "still claiming to be residing in Ohio at that time." As to visitation with either of their [C]hildren, May of 2020 was the actual last in-person visit. When asked how Minor Child M.H.R. is

- 15 -

doing since he has been in care, Caseworker Rash answered he "has been doing great." The Kinship paternal uncle and his wife "are meeting all of his needs" and there is a "healthy bond between them." Caseworker Rash responded Minor Child M.H.R. has not … suffered a "detrimental effect by not seeing his parents since the May 2020 in-person visit or the virtual visit in June of 2020. Minor Child P.A.R. "hasn't seen her parents since she was born" and her Kinship paternal uncle and his wife are the only parents she has known. Caseworker Rash confirmed "it would be in these [C]hildren's best interest if the [M]other's parental rights were to be involuntarily terminated" since "[M]other has not made any progress on her court[-]ordered treatment plan." Neither Minor Child M.H.R, nor Minor Child P.A.R. "…even recognize [Mother] as their mother." Caseworker Rash stated [that] "it would be more detrimental to not terminate Mother's parental rights." Indeed, the parent-child bond with each Minor Child is a "healthy one" with the paternal uncle and his wife, not with the Mother.

Caseworker Vicander credibly stated Minor Child M.H.R. and Minor Child P.A.R. "are doing very well in their current placement" and confirmed "this would be an adoptive resource." Caseworker Vicander maintained that termination of parental rights is in "the best interest of these [C]hildren" because Minor Child M.H.R. and Minor Child P.A.R. have not seen their Mother "in person since June 2020." In addition, "[P]arents weren't able to rectify the situation that led to their placement." As confirmed by Caseworker Vicander, there would be "no negative effect" on either Minor Child if Mother's rights were terminated.

\* \* \*

This IVT [c]ourt finds and concludes that indeed nothing has changed with Mother. Minor [C]hild[ren] M.H.R. and P.A.R. need to move onto permanency, and in fact, these Minor Children deserve permanency. The testimony reflects these Minor Children will suffer no irreparable harm with Mother's parental rights being involuntarily terminated. This IVT [c]ourt has also considered the importance of the continuity of Minor Children's relationship with the paternal uncle and his wife who are meeting the developmental, physical[,] and emotional needs of these Minor Children in their best interests. For all of the above reasons, [the Agency] has met its burden of proof by clear and convincing evidence under 23 Pa.C.S. §2511(b).

TCO at 55-56, 57-58 (citations to the record omitted).

Again, our review of the record reveals that it supports the trial court's conclusion that terminating Mother's parental rights would best serve Children's needs and welfare. Children have spent nearly their entire lives with their paternal uncle and his wife and, thus, it is clear that Children should not be removed from their care. Children will not suffer irreparable harm if Mother's parental rights are terminated.

Accordingly, our independent review of Mother's claims demonstrates that they do not entitle her to relief. Moreover, our review of the record does not reveal any non-frivolous issues overlooked by counsel. **_See Flowers_**, 113 A.3d at 1250. Therefore, we grant counsel's petition to withdraw, and affirm the trial court's decrees.

Decrees affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/7/2022